COOLEY LLP
STEPHEN C. NEAL (170085) (nealsc@cooley.com)
MICHELLE S. RHYU, PH.D. (212922) (rhyums@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 857-0663

COOLEY LLP
MARTIN S. SCHENKER (109828) (mschenker@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Plaintiff
ONYX PHARMACEUTICALS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ONYX PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BAYER CORPORATION, BAYER AG, BAYER HEALTHCARE LLC, AND BAYER SCHERING PHARMA AG,<br><br>Defendants. | Case No. C 09-2145 (MHP)<br><br>**STIPULATION TO FILE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(A)(2)** |

**THE PARTIES HEREBY STIPULATE AS FOLLOWS:**

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, the parties, by and through their undersigned counsel of record, agree that Plaintiff, Onyx Pharmaceuticals, Inc., may file a Second Amended Complaint, which is attached hereto as Exhibit A, and that the Defendants reserve all rights and defenses.

Dated: June 15, 2010

COOLEY LLP

/s/Martin S. Schenker
Martin S. Schenker
Attorneys for Plaintiff
ONYX PHARMACEUTICALS, INC.

Dated: June 15, 2010

BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP

/s/Jason Peltz
Jason Peltz
Attorneys for Defendants
BAYER CORPORATION, BAYER AG, BAYER HEALTHCARE LLC, AND BAYER SCHERING PHARMA AG

June 21, 2010

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
IT IS SO ORDERED
Judge Marilyn H. Patel

2.

STIPULATION TO FILE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(A)
CASE NO.: CV 09 2145 (MHP)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**GENERAL ORDER 45 ATTESTATION**

In accordance with General Order 45, concurrence in the filing of this document has been obtained from each of the signatories and I shall maintain records to support this concurrence for subsequent production for the court if so ordered or for inspection upon request by a party.

Dated: June 15, 2010

COOLEY LLP

/s/Martin S. Schenker

Martin S. Schenker
Attorneys for Plaintiff
ONYX PHARMACEUTICALS, INC.

1183869 v1/SF

3.

STIPULATION TO FILE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(A)
CASE NO.: CV 09 2145 (MHP)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COOLEY LLP
STEPHEN C. NEAL (170085) (nealsc@cooley.com)
MICHELLE S. RHYU, PH.D. (212922) (rhyums@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 857-0663

COOLEY LLP
MARTIN S. SCHENKER (109828) (mschenker@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Plaintiff
ONYX PHARMACEUTICALS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ONYX PHARMACEUTICALS, INC.,

Plaintiff,

v.

BAYER CORPORATION, BAYER AG, BAYER HEALTHCARE LLC, AND BAYER SCHERING PHARMA AG,

Defendants.

Case No. C09-02145 MHP

**SECOND AMENDED COMPLAINT FOR:**

**(1) BREACH OF CONTRACT;**
**(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
**(3) BREACH OF FIDUCIARY DUTY; AND**
**(4) DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

Onyx Pharmaceuticals, Inc. ("Onyx") alleges as follows:

**1.** Onyx files this lawsuit to stop Bayer Corporation ("Bayer") from seizing for itself what the parties agreed to share – the proceeds from a potentially lifesaving and lucrative cancer drug discovered through the parties' longstanding scientific collaboration.

**2.** That collaboration, first formalized in a 1994 Collaboration Agreement, merged Onyx's expertise regarding a biochemical process associated with the growth of cancer cells (and potential therapies for preventing growth of those cells) with Bayer's experience with small molecule pharmaceutical compounds. Following years of investigation and analysis, the parties identified a compound, known as sorafenib, as a promising candidate, and agreed to move forward with development activities, including clinical trials. Under the Collaboration Agreement, the parties equally shared the costs of development. For Bayer, the American arm of a multinational pharmaceutical giant, the costs were modest. But for Onyx, a start-up company with few assets beyond the human capital of its scientists, the investment in sorafenib literally was a "bet the company" proposition. To finance its share of the cost, Onyx was forced to sacrifice all activities not essential to the development of sorafenib: the company shut down all of its discovery efforts on other compounds, laid off its entire drug discovery team, and terminated an unrelated clinical program.

**3.** Ultimately, Onyx's gamble paid off. Sorafenib (marketed as "Nexavar®") received regulatory approvals worldwide for the treatment of advanced kidney cancer and liver cancer, and has generated sales to date of more than a billion dollars, as well as substantial profits, which the parties have shared. From Onyx's perspective, the Collaboration Agreement has been an overwhelming success.

**4.** Bayer, as it turns out, held a different view. Now that Onyx had taught Bayer how to identify effective targeted cancer therapies and introduced Bayer to a class of compounds with potent anti-cancer properties, Bayer was no longer satisfied with the division of sorafenib's profits. Bayer therefore devised a plan in an effort to bypass the Collaboration Agreement's profit-sharing formula and appropriate for itself a substantially greater share of the joint venture's blockbuster discovery. Bayer embarked on a secret program to develop a compound that the parties first identified early in their collaboration. This compound, known as fluoro-sorafenib, is identical to sorafenib, except for the substitution of a single fluorine atom in the place of a hydrogen atom. Bayer, together with its parent company, Bayer AG, and its affiliates, including Bayer HealthCare LLC ("Bayer HealthCare") and Bayer Schering Pharma AG ("Bayer Schering

Pharma"), then moved forward to develop the compound outside the Collaboration Agreement, surreptitiously filing patent applications and initiating clinical trials. When Onyx recently discovered this scheme and confronted defendants, they refused to concede Onyx's rights in fluoro-sorafenib and refused to allow Onyx to join in bringing the compound to market.

**5.** Onyx brings this suit to establish its rights to fluoro-sorafenib and to recover the damages caused by defendants' actions.

## THE PARTIES

**6.** Plaintiff, Onyx Pharmaceuticals, Inc., is a small but innovative biopharmaceutical company based in Emeryville, California. Onyx was founded in 1992 by a team of scientists internationally recognized for their understanding of the biochemical mechanisms of cancer cells. In particular, the Onyx scientists had a specialized understanding of an intracellular pathway, known as the Ras Pathway, associated with the uncontrolled growth of cancer cells. Onyx's highly specialized knowledge of the Ras Pathway enabled it to identify targets for pharmaceutical compounds that would inhibit cancer cell proliferation and to devise laboratory tests or "assays" to assess a compound's efficacy in doing so. Onyx also possessed a "library," or collection, of chemical compounds to test once the assays were developed. Onyx was thus uniquely positioned with the talent and know-how to search for and identify novel drugs for treating cancer. A number of large pharmaceutical companies recognized Onyx's unique capabilities and sought research partnerships to tap into Onyx's expertise.

**7.** Onyx's commitment to translating its knowledge of cellular processes into effective cancer treatments has proved successful. Its lead cancer drug, sorafenib, is approved in over 70 countries for the treatment of patients with advanced kidney cancer and/or liver cancer. Sorafenib also is being evaluated for treatment of patients with lung cancer, breast cancer, and other cancers.

**8.** Onyx is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Emeryville, California.

**9.** Bayer Corporation is, and at all relevant times was, a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located in

Pittsburgh, Pennsylvania. Before approximately March 28, 1995, Bayer Corporation operated under the name Miles Inc.

**10.** Onyx is informed and believes, and on that basis alleges, that Bayer HealthCare is a limited liability company whose sole owner and member is Bayer Corporation. Onyx is further informed and believes, and on that basis alleges, that in 2007, the right, title, and interest in and to the Collaboration Agreement were assigned to Bayer HealthCare LLC.

**11.** Bayer Schering Pharma is a corporation organized and existing under the laws of Germany, with its principal place of business located in Berlin, Germany.

**12.** Bayer Corporation, Bayer HealthCare and Bayer Schering Pharma are part of Bayer AG, a German holding company with over 100,000 employees, operations in nearly every country in the world, and sales in 2008 exceeding 32 billion Euros. Bayer AG is a corporation organized and existing under the laws of Germany, with its principal place of business located in Leverkusen, Germany.

## JURISDICTION AND VENUE

**13.** This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a), in that this is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars ($75,000.00).

**14.** This Court has jurisdiction over the defendants because they actively do business in California and have sufficient minimum contacts in California, or otherwise intentionally availed themselves of the benefits of conducting business in California to be subject to the court's jurisdiction. In particular, the Collaboration Agreement was negotiated within the jurisdiction of this Court, and the parties understood that Onyx's obligations under the Agreement would be performed within this Court's jurisdiction. The Collaboration Agreement and the Letter Agreement (described below) expressly provide that they are governed by California law.

**15.** Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c). A substantial part of the events underlying this action occurred within this district. This Court also has personal jurisdiction over defendants and, accordingly venue is proper.

**INTRADISTRICT ASSIGNMENT**

**16.** The appropriate Intradistrict Assignment for this case is the San Francisco Division or the Oakland Division, pursuant to Civ. L.R. 3-2(c) and (d). A substantial part of the events underlying this action occurred within Alameda County and Contra Costa County.

**COMMON ALLEGATIONS**

**The Collaboration Agreement**

**17.** In the early 1990s, Bayer AG established the goal of exploiting new business opportunities in the market for targeted cancer therapies. Bayer AG and its affiliates, however, lacked the scientific expertise to research and develop these therapies independently. Bayer AG recognized the expertise of Onyx's scientists in the Ras Pathway, and understood that identifying compounds that inhibit proteins in the Ras Pathway could be the key to success in targeted cancer research. Bayer AG therefore approached Onyx and sought to gain access to the company's technology, know-how, and library of chemical compounds that could have effects on the Ras Pathway.

**18.** Bayer AG and Onyx engaged in extensive negotiations over the terms of the proposed collaboration to develop cancer drugs. Late in the negotiations, Bayer AG informed Onyx that Bayer (then known as Miles Inc.), not Bayer AG, would be the party that would sign a contract with Onyx. Shortly thereafter, on April 22, 1994, Onyx and Bayer entered into a Collaboration Agreement. Under the Collaboration Agreement and its 1996 and 1999 amendments, the parties committed to work together to discover, develop and market chemical compounds having activity against proteins in the Ras Pathway.

**19.** Onyx recognized that other companies within the Bayer AG family of companies might assist Bayer in performing under the Collaboration Agreement, and was concerned by Bayer AG's late substitution of Bayer as the contracting party. Accordingly, "as an inducement to Onyx to execute the Agreement," Bayer AG entered into an agreement (the "Letter Agreement") with Bayer, contemporaneous with the signing of the Collaboration Agreement, confirming that, to the extent Bayer AG or any of its "Affiliates" conducted research, development, or marketing or otherwise undertook Bayer's obligations under the Collaboration

Agreement, the Affiliates would "do so in accordance with the provisions of the Agreement." "Affiliate" was defined in the Collaboration Agreement and the Letter Agreement as any entity that, directly or indirectly, is under common ownership with Bayer. The Letter Agreement between Bayer and Bayer AG expressly recognized Onyx as a third-party beneficiary. Onyx recently was informed by Bayer, and on that basis alleges, that the Letter Agreement was transferred to Bayer Schering Pharma. Pursuant to such transfer, Bayer Schering Pharma now holds (jointly with Bayer AG) Bayer AG's rights and obligations there-under.

**20.** The Collaboration Agreement defined two categories of compounds, referred to as "Collaboration Compounds" and "Post-Collaboration Compounds," that are the subject of joint development. Collaboration Compounds generally cover compounds that, before January 31, 2000, were "discovered, identified or synthesized" by Onyx or Bayer and "recognized" as satisfying the standard for cancer inhibiting activity set forth in Exhibit D to the Collaboration Agreement. Post-Collaboration Compounds generally cover those compounds (a) whose chemical genus both covers a Collaboration Compound and is claimed in an Onyx or Bayer patent and (b) that were "synthesized, identified or discovered" and recognized before a later cutoff date as satisfying the standard in Exhibit D.

**21.** The Collaboration Agreement specifies the requirements for developing Collaboration Compounds and Post-Collaboration Compounds into marketable, FDA-approved products. The Collaboration Agreement requires the parties to work together in such development and allows one party to pursue independent pre-clinical research of a Collaboration Compound only if the other party is first given the opportunity for joint pre-clinical research and declines to participate. Even then, however, the party pursuing independent pre-clinical research must offer the other party the opportunity to collaborate in development if the research looks promising.

**22.** The Collaboration Agreement established a Joint Research and Development Committee (JRDC), populated by representatives of Bayer and Onyx, to govern the collaboration. The role of the JRDC was to manage and make decisions regarding the collaboration. The JRDC, later renamed the Joint Development Committee, still exists and continues to meet.

**23.** So that those decisions could be well informed, the Collaboration Agreement established numerous obligations for information disclosure and good faith between the parties. Article 10.1 of the Collaboration Agreement, for example, requires full disclosure to the other party of "the Information and all other significant information, data, and results known or developed by each party as of the Effective Date and during the Research Term" (defined to end on January 31, 1999) "as soon as practicable" after the information is obtained or its significance is appreciated.

**24.** Article 10.2 of the Collaboration Agreement extends the obligation to make quarterly reports to the JRDC beyond the Research Term, such that, if a party continues work on Collaboration Compounds not yet in development as of the end of the Research Term, it must provide sufficient disclosure to enable the other party to assess whether or not to pursue joint funding of pre-clinical research and/or development.

**25.** Article 20.2 addresses patent disclosures, obligating a party to disclose to the other party patentable inventions arising in the course of the collaboration. This section also requires a party to furnish the other party with drafts of any patent application that discloses a Collaboration Compound, allowing adequate time for review and comment before filing.

**26.** Article 26.2 of the Collaboration Agreement recognizes (similar to the Bayer AG Letter Agreement) that Bayer may perform its obligations through Affiliates and provides that, in such cases, Bayer "shall remain responsible and be guarantor" of the Affiliates' compliance with the provisions of the Collaboration Agreement.

**27.** Article 28.1 of the Collaboration Agreement provides that any assignment of rights or obligations under the Agreement by Bayer to any Affiliate shall not relieve Bayer of its responsibilities for performance of its obligations under the Agreement.

**28.** In the course of negotiations, the parties emphasized the importance of a collaborative relationship built on principles of trust and good faith. To embody this model, the parties included in Article 3.6 of the Collaboration Agreement an express covenant of good faith:

> In all matters related to the collaboration established by this Agreement, the Parties shall be guided by standards of reasonableness in economic terms and

> fairness to each of the Parties, striving to balance as best they can the legitimate interests and concerns of the Parties and to realize the economic potential of the Products. In conducting research, development, and commercialization activities under this Agreement neither Party shall prejudice the value of a Product by reason of such Party's activities outside of the Field.

**29.** The Collaboration Agreement also sought to ensure that Onyx and Bayer shared in the risks as well as the rewards of drug discovery. For example, the parties were to share equally in the costs of co-developing Collaboration Compounds and Post-Collaboration compounds for the marketplace, which might entail expensive and lengthy clinical trials for which approval would be far from assured. If successful, however, the parties would share in the rewards. For any co-developed Collaboration Compound sold in the marketplace, the reward was to be an equal share of the profits. For any Post-Collaboration Compound, the reward was to be a royalty paid by the seller.

**Steps in the Collaboration**

**30.** Early in the collaboration, the parties agreed that one Ras Pathway protein, raf kinase, would be a good target for investigation. Raf kinase was understood to be involved in processes leading to cell division and proliferation. The parties hypothesized that raf kinase inhibitors, or chemical compounds that inhibit raf kinase, would prove effective in controlling cancer cell growth. Using their expert knowledge of the Ras Pathway, Onyx scientists created a unique assay, exclusive to the collaboration, that could test the raf-inhibitory activity of any compound.

**31.** With the assay in hand and its own library of small molecule compounds in house, Onyx began searching for a Ras Pathway inhibitor. This effort succeeded, and Onyx identified an inhibitor, dubbed N34213. Although N34213 was too weak an inhibitor to develop as a cancer treatment, the basic chemical structure of that compound provided the key information that Bayer and Onyx used to create thousands of synthetic compounds for further evaluation. As the number of synthesized compounds increased over the course of the collaboration, the parties decided that Bayer would conduct initial tests on the synthesized compounds, using the assay created by Onyx. Onyx thus conveyed the assay protocol to Bayer, along with various purified reagents

necessary to carry out the assay.

**32.** Bayer synthesized and ran initial tests on compounds. They discussed some of these results with Onyx, and transferred some of these compounds to Onyx for further evaluation. Following discussions with Onyx, Bayer also synthesized additional compounds that were structural analogs of compounds that showed promising activity.

**Sorafenib and Its Analogs**

**33.** This collaborative process ultimately led the parties to their pioneering cancer drug sorafenib. Sorafenib was so effective at inhibiting raf kinase, in fact, that it satisfied the specified standard for inhibitory activity set forth in Exhibit D by a factor of more than 1000. Eventually, the parties learned that sorafenib inhibited other biological targets as well, rendering it a "multi-kinase" inhibitor.

**34.** Sorafenib was not the only compound discovered and recognized to have inhibitory activity under the collaboration. Bayer filed a patent application on January 13, 1999 (during the Research Term) that illustrates over 100 compounds (including sorafenib) that have raf-kinase inhibitory activity satisfying the standard specified in Exhibit D.

**35.** The January 13, 1999 patent application also shows that a sorafenib molecule can be modified at one particular location with minimal effect on its raf-kinase inhibitory activity. The chemical formula for sorafenib is illustrated below in Figure 1, with an arrow pointing to the position "2" on the central ring structure of the molecule. In sorafenib, that position has a hydrogen atom attached to the ring (per standard chemical drawing practice, the hydrogen is not shown). The January 13, 1999 application explicitly shows two substitutions at this position. In one case, a chlorine atom (Cl) replaces the hydrogen. In another case, a much larger, methyl group ($CH_3$), replaces the hydrogen. In both cases, the compounds were confirmed to have raf kinase inhibitory activity well within the specified standard in Exhibit D to the Collaboration Agreement.



**Figure 1: Sorafenib (indicating position "2")**

**36.** The illustrated compounds are not the only ones discussed and described in the January 13, 1999 application. In text, the patent application explains that "halogens," a class of elements to which both fluorine and chlorine belong, can be substituted for one another in the compound. The patent that ultimately issued from this application as United States Patent No. 7,351,834 claims the chemical structures of sorafenib and its halogenated brethren, and reports the raf kinase-inhibiting properties of the entire family. Accordingly, the raf kinase-inhibiting properties of sorafenib, chloro-sorafenib and fluoro-sorafenib were recognized well before the cutoff date for the recognition of Collaboration Compounds, January 31, 2000.

**37.** The chemical formulas for sorafenib and the fraternal twins chloro- and fluoro-sorafenib, are illustrated below in Figures 2, 3 and 4, respectively.

**Figure 2: Sorafenib**

**Figure 3: Fluoro-Sorafenib**

**Figure 4: Chloro-Sorafenib**

**38.** The parties fully understood, well before the cutoff date for the recognition of Collaboration Compounds, January 31, 2000, that sorafenib and its halogenated twins would exhibit raf kinase-inhibitory activity well within the specified standard. This is no surprise given that sorafenib and its halogenated brethren are, chemically speaking, nearly identical.

**39.** Ultimately, the parties chose to develop sorafenib and began clinical trials in late 2000. In accordance with the Collaboration Agreement, the parties co-funded the clinical trials, and Onyx made substantial payments to Bayer, which otherwise funded and managed the trials. The trials ultimately proved successful, leading to FDA approval in 2005 and 2007 for the marketing of sorafenib for treating patients with kidney and liver cancer, respectively.

**Bayer's Secret Scheme to Develop Fluoro-Sorafenib**

**40.** Meanwhile, as the jointly-funded clinical trials progressed and Bayer began to realize that sorafenib was destined for success, defendants secretly launched a plan to displace it. In or around 2003, Bayer, along with other subsidiaries of Bayer AG, surreptitiously began filing patent applications directed to fluoro-sorafenib. Fluoro-sorafenib was not a compound that Bayer had recently discovered or, indeed, that involved any new discovery effort by Bayer or its Affiliates following the end of the Research Term in early 1999. On the contrary, Onyx and Bayer had explicitly identified fluoro-sorafenib in 1998. Nonetheless, neither Bayer nor its Affiliates disclosed the patent filings for fluoro-sorafenib to Onyx, which remained unaware of these actions. Then, in or around 2005, Bayer and its Affiliates announced clinical trials on a cancer drug they referred to as DAST. But the announcement omitted the chemical formula for DAST, leaving Onyx unaware that DAST was a code name for fluoro-sorafenib. Nor did defendants ever notify the Joint Development Committee that they were beginning clinical trials on a compound that arose from the collaboration. Defendants have given Onyx no chance to review and comment on the clinical trial submissions, much less to participate in the trials.

**41.** In or around April 2007, Bayer Affiliates made a presentation to Onyx of various cancer compounds they were investigating. But despite the fact that clinical trials for fluoro-sorafenib had been initiated in 2005 and were ongoing, the executives and employees attending the April 2007 meeting failed to disclose to Onyx that Bayer Affiliates were developing fluoro-sorafenib.

**42.** Bayer Affiliates then began publishing their research and discovery efforts with DAST. In June 2007, Bayer HealthCare AG and Bayer Schering Pharma announced DAST as being one of their development candidates for cancer therapy (again without revealing that it was fluoro-sorafenib).

**43.** In early 2009, as the details of the DAST clinical trials became better known, Onyx asked Bayer Affiliates to reveal the chemical structure of DAST. Initially, they denied that DAST was a Collaboration Compound, but refused to reveal more. Finally, on March 31, 2009, an executive of Bayer HealthCare Pharmaceuticals, Inc. (an Affiliate of Bayer), admitted that the

chemical structure of DAST was, indeed, fluoro-sorafenib. According to the executive, because Bayer had postponed testing of fluoro-sorafenib until after January 31, 2002, Bayer had not "recognized" that the compound satisfied the specified standard for ras inhibitory activity by that date. Accordingly, the executive declared, Bayer and its Affiliates are entitled to develop and market fluoro-sorafenib "unrestrained" by Onyx.

**44.** On April 15, 2009, Onyx proposed a meeting of executives to negotiate in good faith toward a resolution of the parties' dispute regarding whether fluoro-sorafenib is covered under the Agreement. The executives met, but the parties were unable to resolve the dispute.

**45.** In May 2009, Bayer HealthCare Pharmaceuticals, Inc., which is responsible for a clinical trial of fluoro-sorafenib in the U.S., reported on the results of a phase II trial in kidney cancer and announced its intention to move forward with a phase III trial. Onyx is informed and believes that if fluoro-sorafenib secures FDA approval, Bayer and its Affiliates intend to market Onyx and Bayer's joint discovery—fluoro-sorafenib—as a direct competitor to the parties' joint product, sorafenib, thereby reaping all of the benefits of the parties' collaboration without sharing the rewards.

**46.** Onyx is informed and believes, and on that basis alleges, that in conducting development and commercialization activities under the Collaboration Agreement, Bayer and its Affiliates prejudiced the value of sorafenib by reason of their interest in other drugs, including fluoro-sorafenib.

**47.** Onyx is informed and believes, and based thereon alleges, that its damages exceed the amount of seventy-five thousand dollars ($75,000), exclusive of costs and interest.

**FIRST CLAIM FOR RELIEF**

**(BREACH OF CONTRACT)**

**48.** Onyx re-alleges and incorporates by reference paragraphs 1-47, inclusive, as though fully set forth herein.

**49.** Onyx performed all of the terms and conditions of the parties' Collaboration Agreement, as amended.

**50.** Defendants breached the Collaboration Agreement by, among other things:

      (a) failing to disclose their research and development plans for fluoro-sorafenib;

(b) failing to treat fluoro-sorafenib as a Collaboration Compound;

(c) undermining the value of sorafenib through their development of fluoro-sorafenib; and

(d) prejudicing the value of sorafenib by reason of their interest in other drugs, including fluoro-sorafenib.

**51.** Defendants further breached their obligations under the Collaboration Agreement and the Letter Agreement to cause their Affiliates to comply with the provisions of the Collaboration Agreement.

**52.** Alternatively, in the event a compound must be tested to be recognized under the Collaboration Agreement as a Collaboration Compound, defendants breached the Collaboration Agreement if (as Bayer claims) they deferred testing of fluoro-sorafenib until after January 31, 2000.

**53.** As a proximate result of defendants' breach of the Collaboration Agreement and the Letter Agreement, Onyx has sustained, continues to sustain, and will sustain damages, including, but not limited to lost sales, damage to goodwill, and the inability to profit from sales of fluoro-sorafenib. In addition, defendants were, are, and will be unjustly enriched through their appropriation for themselves of the entire value of fluoro-sorafenib.

**SECOND CLAIM FOR RELIEF**

**(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

**54.** Onyx re-alleges and incorporates by reference paragraphs 1-47, inclusive, as though fully set forth herein.

**55.** A covenant to deal fairly and act in good faith is implied in the Onyx/Bayer Collaboration Agreement and later amendments.

**56.** Defendants breached these covenants by, among other things:

(a) failing to disclose their research and development plans for fluoro-sorafenib;

(b) failing to treat fluoro-sorafenib as a Collaboration Compound;

(c) undermining the value of sorafenib through their development of fluoro-sorafenib; and

(d) prejudicing the value of sorafenib by reason of their interest in other drugs, including fluoro-sorafenib.

**57.** Defendants further breached these covenants by failing to satisfy their obligations under the Collaboration Agreement and the Letter Agreement to cause their Affiliates to comply with the provisions of the Collaboration Agreement.

**58.** Alternatively, in the event a compound must be tested to be recognized under the Collaboration Agreement as a Collaboration Compound, Bayer breached these covenants if (as Bayer claims) it deferred testing until after January 31, 2000.

**59.** As a proximate result of defendants' breach of the Collaboration Agreement and the Letter Agreement, Onyx has sustained, continues to sustain, and will sustain damages, including, but not limited to lost sales, damage to goodwill, and the inability to profit from sales of fluoro-sorafenib. In addition, defendants were, are, and will be unjustly enriched through their appropriation for themselves of the entire value of fluoro-sorafenib.

**THIRD CLAIM FOR RELIEF**

**(BREACH OF FIDUCIARY DUTY)**

**60.** Onyx re-alleges and incorporates by reference paragraphs 1-47, inclusive, as though fully set forth herein.

**61.** The Collaboration Agreement created a legal joint venture. As collaborators and joint venturers, defendants owed Onyx the highest degree of fiduciary duty, including but not limited to the duty of loyalty and honesty.

**62.** Defendants breached their fiduciary duty to Onyx by, among other things:

(a) failing to disclose their research and development plans for fluoro-sorafenib;

(b) failing to treat fluoro-sorafenib as a Collaboration Compound;

(c) undermining the value of sorafenib through their development of fluoro-

sorafenib; and

(d) prejudicing the value of sorafenib by reason of their interest in other drugs, including fluoro-sorafenib.

**63.** Alternatively, in the event a compound must be tested to be recognized under the Collaboration Agreement as a Collaboration Compound, Bayer Corporation breached its fiduciary duty if (as Bayer claims) it deferred testing until after January 31, 2000.

**64.** As a proximate result of defendants' breach of the Collaboration Agreement and the Letter Agreement, Onyx has sustained, continues to sustain, and will sustain damages, including, but not limited to lost sales, damage to goodwill, and the inability to profit from sales of fluoro-sorafenib. In addition, defendants were, are, and will be unjustly enriched through their appropriation for themselves of the entire value of fluoro-sorafenib.

**65.** Defendants' conduct in breaching their fiduciary duties was malicious, oppressive, fraudulent, and otherwise entitles Onyx to an award of exemplary and punitive damages.

**FOURTH CLAIM FOR RELIEF**

**(DECLARATORY RELIEF)**

**66.** Onyx re-alleges and incorporates by reference paragraphs 1-47, inclusive, as though fully set forth herein.

**67.** Onyx desires a declaration regarding its rights to fluoro-sorafenib.

**68.** An actual controversy exists between Onyx and the defendants relating to their respective rights to fluoro-sorafenib. In particular, there is a dispute regarding whether fluoro-sorafenib is a Collaboration Compound. Defendants contend that it is not, and that they therefore may independently develop fluoro-sorafenib and eventually sell it without sharing profits with Onyx. Onyx contends that fluoro-sorafenib is a Collaboration Compound, entitling Onyx to participate equally in co-development and to share equally in the profits from any future sales.

**69.** In order to resolve this dispute, Onyx requests that the Court declare the rights and obligations of the parties regarding fluoro-sorafenib. Specifically, Onyx requests a declaration that fluoro-sorafenib is a Collaboration Compound, that Onyx is entitled to participate equally in co-development, and that Onyx should receive a 50% share in the profits (as defined in the

Collaboration Agreement) from any future sales of fluoro-sorafenib.

**WHEREFORE**, Onyx prays for the following relief:

1. That this Court award compensatory damages to Onyx in an amount to be proven at trial;

2. That this Court award punitive damages to Onyx in amount to be determined at trial;

3. That this Court award to Onyx the benefits and profits enjoyed by defendants as a result of their unjust enrichment as determined at trial;

4. That this Court declare fluoro-sorafenib to be a Collaboration Compound as defined under the parties' Collaboration Agreement;

5. That this Court order defendants to allow Onyx to participate in co-development of fluoro-sorafenib under the parties' Collaboration Agreement;

6. That this Court declare that Onyx is entitled to a 50% share in the profits from any future sales of fluoro-sorafenib by defendants, as defined in the Collaboration Agreement;

7. That this Court enjoin defendants from developing fluoro-sorafenib without Onyx's participation;

8. That this Court award Onyx its costs, including attorneys' fees to the extent allowable; and

9. That this Court grant Onyx such additional relief as it deems just and proper.

Dated: June 15, 2010

COOLEY LLP
MARTIN S. SCHENKER (109828)

/s/ Martin S. Schenker
Martin S. Schenker (109828)
Attorneys for Plaintiff
ONYX PHARMACEUTICALS, INC.