**United States District Court**
For the Northern District of California

1

2

3

4

5                     UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7

8    ONYX PHARMACEUTICALS, INC.,              No. C-09-2145 EMC

9              Plaintiff,

10         v.                                 **FINAL PRETRIAL CONFERENCE
                                              ORDER**
11   BAYER CORPORATION, *et al.*,

12             Defendants.
     _____/
13

14

15         A Final Pretrial Conference was held in this matter on September 20, 2011.  Pursuant to

16   Federal Rule of Civil Procedure 16(e), this order memorializes the Court's rulings and/or the parties'

17   stipulations.  Also attached are the Court's standing Guidelines for Trial.

18                    **I.    TRIAL DATE & LENGTH OF TRIAL**

19         The trial shall begin on October 3, 2011, Courtroom 5, 17th Floor.  There shall be a total of

20   twelve court days.

21         Trial shall be conducted from 8:30 a.m. to 2:00 p.m. (or slightly longer to finish a witness),

22   with one 15-minute break and one 40-minute lunch break.  Parties must arrive by 8:00 a.m. or earlier

23   as needed for any matters to be heard out of the presence of the jury.  The jury will be called at 8:30

24   a.m.  The trial week is Monday through Thursday, excluding holidays.  Fridays are dark.  If there are

25   matters that need to be discussed (*e.g.*, objections to exhibits or witnesses), counsel should be

26   prepared to meet with the Court at 8:00 a.m.

27         Plaintiff shall have 22 hours to present her evidence, and Defendant 22 hours.  This includes

28   direct examination by one side of its witnesses, cross-examination by that side of the opposing

1   party's witnesses, and any rebuttal.  This does not include jury selection, jury instructions, opening

2   statements, or closing arguments.  The Court may impose separate time limits for openings and

3   closings.

**II.   MOTIONS IN LIMINE**

A.   Defendant's Motion in Limine (Docket No. 140)

Bayer's Motion in Limine requests that the Court exclude four categories of evidence.  For

the reasons set forth below, the Court DENIES the motion without prejudice.

1.   Evidence of Negotiators' Unexpressed Intent

Bayer seeks to prevent Onyx from introducing evidence as to the unexpressed intent and

understanding of Onyx's negotiators to the Collaboration Agreement.  Mot. in Limine, Docket No.

140 ("Mot."), at 1.  These witnesses are Frank McCormick, Bob Jones, and Hollings Renton.  Bayer

contends that their testimony as to the meaning of the contract is inadmissible under Rule 402 and

403 because they merely testify as to their own subjective, which is irrelevant under California law.

Mot. at 2.  Bayer asks the Court to restrict the testimony of these witnesses to objective, expressed

intent rather than subjective, understood intent.  Onyx counters that these witnesses will testify not

as to their subjective intent, but rather the parties' mutual intent and understanding of the contract

terms.  It argues that the witnesses are permitted to testify as to expressed and unexpressed

representations during the course of negotiations.  Opp. at 1.

Bayer overstates California law's restrictions on witness testimony as to a contract's

meaning under the objective theory of contracts.  Bayer seeks to exclude these witnesses' testimony

based on their admissions at some point in their depositions that they did not recall "specific

discussions" during the course of negotiations as to the meaning of certain specific words in the

contract.  *See* Mot. at 2-3 (citing portions of Renton depo.); *id*. at 4 (citing portions of McCormick

depo.); *id*. (citing portions of Jones depo.).  However, contrary to Bayer's implication, these

admissions do not amount to any broad concession that these witnesses remember nothing from the

negotiations that would inform their memory of and testimony as to the parties' expressed intent.  A

lack of specific recollection does not change the nature of the testimony, only its weight.  None of

2

**United States District Court**
For the Northern District of California

the cases to which Bayer cites require witnesses to quote from negotiations or provide a detailed

account of "specific discussions" in order to testify as to their memory of those negotiations.  For

example, Bayer cites to *Founding Members of Newport Beach Country Club v. Newport Beach*

*Country Club, Inc*., 109 Cal. App. 4th 944, 960 (2003).  However, *Founding Members* does not

stand for the broad proposition that all testimony as to a negotiator's understanding of contract terms

is inadmissible.  Rather, *Founding Members* merely holds that conversations between members of

the same side in a negotiation, conversations between those persons and a sales assistant,

conversations with undisclosed third parties, and undisclosed statements of individual intent are not

relevant under the "objective theory of contracts."  *Id.*  Other cases on which Bayer relies for support

similarly do not discuss or require the specificity it requests that this Court impose.  *See Winet v.*

*Price*, 4 Cal. App. 4th 1159, 1166 (1992) (disregarding "testimony as to what [the witness]

subjectively understood and intended the release to encompass"); *Habitat Trust for Wildlife, Inc. v.*

*City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1339 (2009) (affirming exclusion of self-

described subjective statement: "I on behalf of Sage Council and Habitat Trust contemplated that the

contract purpose of the Settlement Release Agreement (Exhibit 41) was to . . . ," where the witness

"does not indicate that she expressed her asserted intention to anyone before or at the time of

contracting" and "her prior language, acts and conduct evidence a contrary intention").

In contrast to these cases and others cited by Bayer, here Onyx's witnesses were present at

the negotiations and contend their understanding of the meaning of contract terms is based on the

course of those negotiations.  *See, e.g.*, Schenker Decl., Exh. 1 at 98 (excerpt of Renton depo. in

which he states that he recalls talking about the definition of a collaboration compound with Bayer

and that the "intent" to which he refers is based on "the assurances that Bayer gave us"); *id*., Exh 26

at 5 (McCormick's declaration explaining the course of the negotiations in which he participated and

his understanding of the contract based on those negotiations); *id*., Exh. 27 at 2-4 (Jones's

declaration explaining the parties' notes and negotiations as to what would constitute a

Collaboration Compound).  This kind of extrinsic evidence is permitted, and indeed required, under

California law.  *See Dept. of Indus. Relations v. UI Video Stores, Inc.*, 55 Cal. App. 4th 1084, 1094

(1997) ("[T]he circumstances surrounding the execution of the contract may be considered in

1   determining the meaning of the language used therein.") (citing Cal. Code Civ. Proc., § 1860); *Pac.*

2   *Gas & Elec. Co. v. G. W. Thomas Drayage and Rigging Co., Inc.*, 69 Cal. 2d 33, 39-40 (1968)

3   ("[R]ational interpretation requires at least a preliminary consideration of all credible evidence

4   offered to prove the intention of the parties.").

5          Moreover, while Bayer is correct that courts have excluded evidence of the unexpressed

6   *intent* of the parties, other courts applying California law have allowed witnesses to testify about

7   their *understanding* of a contract when that understanding is not simply a private interpretation, but

8   rather is founded in personal knowledge of the negotiations and the parties' expressed intent.  *See*

9   *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1068 (9th Cir. 2011) (witness

10  testified as to "his understanding of the 'subject only to approval' clause"); *Mickey Bearman Co. v.*

11  *John Morrell & Co.*, No. CV-00-05616 CAS (MCX), 2001 U.S. Dist. LEXIS 26233, at *6-7 (C.D.

12  Cal. Oct. 29, 2001) (attorney "who participated in the negotiations of the [contract], is entitled to

13  testify as to what he, as a representative of [Defendant], thought the ambiguous terms meant."); *ASP*

14  *Properties Group v. Fard, Inc*., 133 Cal. App. 4th 1257, 1271 (2005) ("When [Defendant's

15  negotiator] was asked whether he understood at the time of negotiating the Amendment [that]

16  Tenant would be required to improve the Premises, he answered, 'Absolutely not.'"); *Pacific Gas &*

17  *Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 39 (1968) (offering, as example of

18  circumstance warranting extrinsic evidence, situations in which "the parties' understanding of the

19  words used may have differed from the judge's understanding" and requiring the court to consider

20  evidence that would place it "in the same situation in which the parties found themselves at the time

21  of contracting"); *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1359-60 (2004) (finding triable

22  issue of fact and lamenting the fact that "neither side presented any direct or objective evidence

23  regarding the negotiating parties' understanding of the term 'gross receipts' at the time the parties

24  entered into the contract.").

25         The Court cannot discern any requirement that testimony must be supported by specific

26  quotations of the words stated in negotiation.  Rather, California case law merely stands for the

27  proposition that a negotiator's testimony as to contract terms must be grounded in some foundation

28  of personal knowledge as to the parties' expressed intent and understanding during the course of

**United States District Court**
For the Northern District of California

4

United States District Court

For the Northern District of California

1    negotiations, rather than simply the witness's own subjective interpretation of the contract or intent

2    as to what the contract should mean.  *See, e.g.*, *Hoopes v. Dolan*, 168 Cal. App. 4th 146, 151 (2008)

3    ("The real estate agent said she conducted the lease negotiations with Hoopes, and that the issue of

4    parking 'never came up' during those negotiations.").  While Bayer is certainly free to impeach the

5    memory and credibility of these witnesses with their own deposition statements that they lacked

6    specific recall of what was stated in the negotiations as to various contract terms, these weaknesses

7    in their testimony are not sufficient to render them inadmissible.

8         Accordingly, Bayer's motion is DENIED as to this point, without prejudice to Bayer's

9    objections at trial if certain portions of the witnesses' testimony are in fact based solely on their

10   subjective, unexpressed intent.

11        2.    Evidence of Bayer's Allegedly Improper Conduct Beyond CRC-KRAS & Breast
               AI

12        Bayer seeks to preclude Onyx from introducing testimony with regard to Bayer's other

13   allegedly improper conduct in the course of developing Nexavar in indications beyond CRC-KRAS

14   and Breast AI, as Onyx has not claimed compensatory damages with respect to that conduct.  *See*

15   Mot. at 1.  Bayer argues that such evidence is irrelevant under Rule 402, prejudicial under Rule 403,

16   and inadmissible character evidence under Rule 404(b).

17        At oral argument, Onyx agreed to drop four of the five indications and trials at

18   issue—pulmonary arterial hypertension ("PAH"); gastrointestinal stromal tumor ("GIST"); thyroid

19   cancer; and breast cancer in combination with the chemotherapy agent capecitabine ("Breast Cape").

20   Thus, the Court only considers the parties' arguments regarding 1st line colorectal cancer ("CRC").

21        With respect to relevance, Bayer contends that evidence of Bayer's alleged efforts to block

22   Nexavar's development in CRC is irrelevant because Onyx does not claim any damages from this

23   conduct, and the fact of damages is a necessary component of Onyx's claims for breach of contract

24   and breach of fiduciary duty.  *See* Mot. at 6.  But as the Court pointed out at the hearing, the alleged

25   conduct as to 1st line CRC, if proven to be part of a larger campaign to promote DAST and

26   undermine Nexavar, is probative to Bayer's motive and conduct vis-a-vis the blocking of Nexavar

27   trials for which damages are sought.  As Onyx noted, both provisions of § 3.6 arguably import (at

28

United States District Court

For the Northern District of California

1    least the jury may so find) motive as an element of the breach claims.  Section 3.6 makes Bayer's

2    motive for blocking Nexavar relevant to whether it has breached the contract because if Bayer

3    blocked Nexavar for legitimate business reasons and in good faith, there is no violation of § 3.6.

4    These documents are also relevant not just to show Bayer's "motive" to breach, but as direct

5    evidence of its alleged bad faith generally in violation of the implied covenant of good faith and fair

6    dealing.  *See Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal.2d 751, 772 (1942) ("In

7    every contract there is an implied covenant that neither party shall do anything which will have the

8    effect of destroying or injuring the right of the other party to receive the fruits of the contract.").  In

9    addition, as discussed above, Bayer's argument against offering evidence of motive is, at the least,

10   inapplicable to Onyx's tort-based claims.

11        Even assuming Bayer is correct that this conduct would be irrelevant for Onyx's damages

12   claims, Bayer neglects to address Onyx's remaining claims, including a claim for declaratory relief

13   in the form of "a declaration that Bayer cannot allow its products outside the Collaboration to

14   prejudice the development of Nexavar."  Joint Pretrial Statement, Docket No. 142, at 7.  While

15   Bayer seems to argue in reply that declaratory relief requires proof of damages as well, *see* Reply at

16   8, such an argument runs directly counter to the provisions of both the California and federal

17   declaratory judgment statutes.  *See* Cal. Code Civ. Pro. § 1060 ("[T]he court may make a binding

18   declaration of these rights or duties, whether or not further relief is or could be claimed at the time. .

19   . . The declaration may be had before there has been any breach of the obligation in respect to which

20   said declaration is sought."); 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing

21   of an appropriate pleading, may declare the rights and other legal relations of any interested party

22   seeking such declaration, whether or not further relief is or could be sought.").[1]

23        In addition, because Onyx will seek to show that Bayer's conduct is sufficiently outrageous

24   to warrant punitive damages, evidence of the scope of Bayer's allegedly wrongful conduct is relevant

25   to such a claim.  Bayer points to the general and undisputed requirement that punitive damages must

26   bear some relationship to compensatory damages as support for its position that evidence of Bayer's

27   other alleged wrongdoing cannot support punitive damages.  *See* Reply at 9 (citing *O'Neil v.*

28   ───────────────
     [1]  Indeed, the cases Bayer cites in support of such a proposition do not even discuss declaratory relief.

1    *Spillane*, 45 Cal.App.3d 147, 161 (1975); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996);

2    *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 776-77 (9th Cir. 2005); *Lew Wenzel & Co. of S. Cal.,*

3    *Inc. v. London Litho Supply Co.*, 563 F.2d 1367, 1368 (9th Cir. 1977).  However, these cases do not

4    stand for the broad proposition that only evidence which is attached to a specific compensatory

5    damages claim is relevant to a claim for punitive damages.  Rather, these cases merely discuss the

6    difficulty of awarding punitive damages when the plaintiff has suffered no compensable harm

7    whatsoever, or when the amount of damages is out of proportion to the amount of compensatory

8    damages.  This does not answer the question of whether evidence for which the plaintiff does not

9    claim damages may nonetheless inform a jury's determination of whether the defendant's conduct is

10   worthy of punitive damages.

11        Indeed, on this question, *BMW* indicates that evidence that does not go directly to

12   compensatory damages is nonetheless relevant and admissible.  In *BMW*, the Supreme Court

13   explicitly noted that conduct which could not form the basis of a punitive damages award—BMW's

14   out-of-state conduct which was not unlawful in those states—was nonetheless relevant.  *See BMW*,

15   517 U.S. at 574 n.21 ("Of course, the fact that the Alabama Supreme Court correctly concluded that

16   it was error for the jury to use the number of sales in other States as a multiplier in computing the

17   amount of its punitive sanction does not mean that evidence describing out-of-state transactions is

18   irrelevant in a case of this kind. To the contrary, as we stated in *TXO Production Corp. v. Alliance*

19   *Resources Corp.*, 509 U.S. 443, 462, n.28 (1993), such evidence may be relevant to the

20   determination of the degree of reprehensibility of the defendant's conduct.").  The Court also

21   considered evidence of potential harm.  *Id*. at 575, 581-82.   Bayer can thus point to no case that

22   suggests that each specific example of wrongdoing must be attached to a compensable damages

23   claim in order to be relevant to its claim that Bayer breached its fiduciary duties and should pay

24   punitive damages for its conduct.[2]

---

25   [2]  Bayer's analysis of *Bradbury*, originally cited by Onyx, is similarly flawed.  *See* Reply at 9 (citing *Bradbury v. Phillips*

26   *Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987).  Bayer seeks to distinguish *Bradbury* based on the fact that the prior conduct at issue in that case—which the court found admissible to show the absence of mistake or accident—had resulted

27   in compensable damages.  Yet *Bradbury's* analysis does not turn on the fact that the defendant had paid damages to past complainants.  Indeed, such a claim is nonsensical because the current plaintiff was not asserting any right to, or harm from, those previous acts.  Thus, such conduct was admissible despite the fact that it did not directly support any damage claim or

28   independent cause of action by the plaintiff.  Rather, the key to the dispute was that the defendant had engaged in other,

Accordingly, Bayer has failed to demonstrate that this evidence is irrelevant. *See* Fed. R. Evid. 401 (defining relevant evidence broadly to include any testimony "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Bayer also contends that this evidence would be prejudicial under Rule 403, and should be excluded on that basis. However, given its relevance as noted above, Bayer has failed to demonstrate that the prejudicial result from its introduction would substantially outweigh its probative value. Fed. R. Evid. 403. Bayer asserts that this evidence would distract and mislead the jury, and lead to a series of mini-trials. However, Onyx has alleviated most of these concerns by eliminating most of the indications at issue. In addition, the fact that Bayer will need to put on additional witnesses to explain and defend its conduct with respect to the same plaintiff, under the same contract, does not lead to the kind of prejudice or potential confusion that substantially outweighs the probative value of this evidence. *Cf. Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (in sexual harassment case, finding that the exclusion of evidence regarding complaints by other, non-plaintiff employees years prior to the conduct at issue in that action was not an abuse of discretion). The evidence is admissible under 403.

Finally, Bayer argues that this evidence is inadmissible character evidence under Rule 404(b), which prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." The Court is not persuaded. As with its arguments discussed above, here Bayer ignores Onyx's non-damages claims, for which evidence of Bayer's alleged blocking of Nexavar in other indications is not "other crimes, wrongs, or acts," but rather is part of the same conduct Onyx challenges here and against which it seeks declaratory and punitive relief. Moreover, Rule 404(b) allows for such character evidence where it may show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." While Bayer is correct that motive is not relevant in an action seeking contract damages, *see Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 516 (1994), Onyx has asserted

---

relevant bad acts, regardless of whether each of those acts were legally cognizable claims, that indicated a pattern of bad conduct sufficient to justify punitive damages.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   tort claims as well as contract claims in this action, and as explained at the hearing, Bayer's motive is

2   relevant to a claim sounding in tort.[3]

3        Accordingly, the Court DENIES without prejudice Bayer's motion to exclude evidence of its

4   alleged efforts to block Nexavar's development in trials other than Breast AI and CRC-KRAS.

5        3.    Evidence Relating to Othello

6        Bayer seeks to exclude any documents related to Project Othello, its internal codename for

7   discussions about its potential acquisition of Onyx in 2009.  Mot. at 8.  Bayer argues that these

8   documents are irrelevant because Bayer never acquired Onyx, and prejudicial under Rule 403.

9        Given the content of these documents—which include admissions that Onyx may use to seek

10  to rebut numerous positions Bayer is taking in this litigation—Bayer has failed to demonstrate that

11  they are irrelevant or substantially more prejudicial than probative.  As Onyx points out, *see* Opp. at

12  16-17, the fact that Bayer never acquired Onyx does not negate the relevance of its discussions to

13  this litigation, as those discussions concerned the relationship and acknowledged potential conflicts

14  between DAST and Nexavar, Bayer's obligations under the contract, and Bayer's ongoing

15  relationship with Onyx.  *See, e.g.*, Trial Exh. 384 at -082-83, (indicating that the "[c]ommercial

16  value of DAST is limited by Onyx partnership" and that DAST is in "direct competition with

17  Nexavar" and has "very similar molecular structure"); Trial Exh. 397 (evaluating economic effects

18  of developing DAST for certain indications instead of Nexavar); Trial Exh. 416 (discussing options

19  for switching certain Nexavar trials to DAST); Trial Exh. 440 (discussing benefits of developing

20  DAST over Nexavar in certain indications).  This evidence is probative of Bayer's knowledge and

21  thus its potential motives irrespective of the fact that it ultimately did not acquire Onyx.

22       Finally, as with the evidence discussed above in the second motion in limine, here Bayer has

23  failed to demonstrate prejudice that would substantially outweigh the probative value of these

24  documents as a whole.  Again, Bayer assumes that this litigation solely involves a claim for breach

25  _____

26  [3]  In its reply, Bayer makes the cursory argument that all of Onyx's claims actually sound in contract, and that therefore its tort claims are not viable.  *See* Reply at 11 and n.4.  However, Bayer has not moved for, nor has the Court granted, dismissal or summary judgment on this basis.  Thus, the fact is that Onyx's tort claims remain in the litigation; Bayer's cursory challenge to their viability at this late hour is unpersuasive.  Similarly, Bayer appears to suggest that because the parties dispute whether a fiduciary duty exists, Onyx should be precluded from introducing evidence that might tend to show breach of such a duty.  *See* Reply at 11 n.4.  This argument is meritless because it presumes Bayer will prevail on a disputed issue.

27

28

9

United States District Court

For the Northern District of California

1  of contract.  *See* Reply at 14.  Though the Court need not determine whether this evidence would be

2  admissible if only contract claims were asserted, because bad faith and breach of fiduciary duty are

3  at issue here, this evidence is sufficiently probative—notwithstanding its potential damaging effect

4  on Bayer—to bring it outside the confines of 403.

5       Bayer's motion to exclude these documents is DENIED without prejudice to more tailored

6  objections on a case-by-case basis.

7       4.   <u>Evidence of Damages</u>

8       Bayer seeks to exclude any testimony from Onyx's damages expert, Iain Cockburn, as to

9  Onyx's claimed damages from lost profits due to Bayer's alleged blocking of Nexavar's

10  development in Breast AI and CRC-KRAS indications.  Mot. at 11.  Bayer argues that Cockburn's

11  testimony cannot establish that Onyx suffered damages with reasonable certainty, as is required

12  under California law.  *See Vestar Development II, LLC v. General Dynamics Corp.*, 249 F.3d 958,

13  961 (9th Cir. 2001) ("It has long been settled in California that 'the proof must establish with

14  reasonable certainty and probability that damages will result in the future to the person wronged.'")

15  (quoting *Caminetti v. Manierre*, 23 Cal.2d 94, 101, 142 P.2d 741, 745 (1943) (in bank)).

16       Bayer's arguments are nearly identical to those it raised in its motion for summary judgment,

17  which Judge Patel denied.  Indeed, much of Bayer's motion appears to have been cut and pasted

18  from its earlier summary judgment motion.  In her order, Judge Patel rejected Bayer's assertion that

19  a 57% percent chance of FDA approval is insufficient to qualify as "reasonably certain."  *See*

20  Memorandum & Order, Docket No. 143, at 20.  She found that "Onyx has raised at least an issue of

21  fact as to the propriety of its requested damages."  *Id*.  Bayer has not requested leave to file a motion

22  for reconsideration of that ruling.  *See* Civ. L.R. 7-9.

23       Moreover, viewed independently, this Court agrees with Judge Patel's conclusion.  Bayer

24  argues that a 57-62% chance of FDA approval is insufficient as a matter of law to create a

25  "reasonable certainty."  Mot. at 13.  In addition, Bayer contends that Onyx should not be permitted

26  to present evidence of "risk-adjusted damages," which it claims demonstrate that Onyx's damages

27  claims are speculative.  *See* Mot. at 15-16.  As Onyx has agreed at oral argument not to introduce

28  any evidence of risk-adjusted damages, the Court considers only the reasonable certainty argument.

United States District Court

For the Northern District of California

Bayer can point to no case, nor has Judge Patel or this Court uncovered such a case, in which California courts have mandated a percentage of certainty above 57% in order to constitute "reasonable certainty." *See* Memorandum & Order, Docket No. 143, at 20. Rather, most cases addressing reasonable certainty adhere to a qualitative approach, and the cases Bayer cites do not support the kind of wholesale rejection of evidence that Bayer requests from this Court. For example, as Judge Patel found, the principal case on which Bayer relies for its assertion that recovering damages for lost profits in pharmaceutical products is "exceedingly difficult," *see AlphaMed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319 (S.D. Fla. 2006), *aff'd*, 294 Fed. Appx. 501 (11th Cir. 2008), is distinguishable on numerous grounds from the instant case. *See* Memorandum & Order at 19 (emphasizing that *AlphaMed*, unlike this case, involved a product that had never been tested, might have been illegal to distribute, and for which it was uncertain whether there was a sufficient research and development budget, among other differences). In another case on which Bayer relies, *Matthews v. Atchison, Topeka & Santa Fe Railway Co.*, 54 Cal. App. 2d 549, 560 (1942), the court was referring to a case in which the court reduced, rather than eliminated, damages to account for their lack of certainty.

Under California law, damages evidence found to be too speculative faced more uncertainty than is present in this case, in which Nexavar has already been approved for two cancer indications and the parties have experience successfully promoting its sale. *See, e.g.*, *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 887-888 (2002) (finding expert testimony insufficient to demonstrate lost profits where a small toy store claimed that flood damage to the store caused by defendant led to $50 million in lost profits because Plaintiff's new website would have allowed it to compete in the Internet toy marketing business); *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (finding lost profits claim too speculative for breach of agreement to negotiate where plaintiff sought "future profits that it hoped to earn from the shopping center it had planned to build on the parcel it was attempting to buy"); *Eisenmayer v. Leonardt*, 148 Cal. 596, 601 (1906) (affirming exclusion of testimony as to value of unissued stock for company never formed because there were "no facts stated—either real or hypothetical—as a basis for an intelligent opinion"); *Greenwich S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 766 (2010) 1(finding lost profits claim too

United States District Court

For the Northern District of California

1   speculative where the plaintiff assumed, rather than proved, the reasonable certainty of future

2   predicate events upon which the damages depended); *Fisher v. Hampton*, 44 Cal. App. 3d 741, 749

3   (1975) (finding lost profits evidence too speculative where "there was no testimony that any oil

4   could be recovered at a profit from the drilling of one well, and there was no testimony as to the

5   extent of possible profits from the one initial well."); *Boyer v. Wells*, No. B205345, 2008 WL

6   3984342, at *8 (Cal. Ct. App. Aug. 29, 2008) ("Blaha's testimony that there are generally unforeseen

7   rebuilding costs was too speculative to require the court to infer that there would be such costs in

8   this case.").  In contrast to these cases, courts allow for projections of lost profits for unestablished

9   businesses when those projections are rooted in sound factual and statistical analysis, even though

10  such testimony does not lend itself to absolute certainties with respect to future damages.  *See Kids'*

11  *Universe v. In2Labs*, 95 Cal.App.4th 870, 884 (2002) ("[I]f the business is a new one or if it is a

12  speculative one . . ., damages may be established with reasonable certainty with the aid of expert

13  testimony, economic and financial data, market surveys and analyses, business records of similar

14  enterprises, and the like."); *Parlour Enterprises, Inc. v. Kirin Group, Inc.*, 152 Cal. App. 4th 281,

15  288 (2007) ([E]xpert testimony alone is a sufficient basis for an award of lost profits in the new

16  business context when the expert opinion is supported by tangible evidence with a 'substantial and

17  sufficient factual basis' rather than by mere 'speculation and hypothetical situations.") (quoting

18  *Kids' Universe*, 95 Cal. App. 4th at 885); 1*A&M Produce v. FMC Corp.*, 135 Cal. App. 3d 473, 494

19  (1982) (finding lost profits from destroyed tomato crop, which plaintiff had never grown before,

20  proven to reasonable certainty where plaintiff "1provide[d] evidence regarding the size of the crop

21  and general market price for that type of tomato, the fact that he was an experienced farmer, the

22  condition of the tomatoes pre-harvest, and the fact that there was no indication anything else would

23  have ruined the crop had the machine functioned properly"); *see also Lightning Lube, Inc. v. Witco*

24  *Corp.*, 4 F.3d 1153, 1176 (3d Cir. 1993) (finding lost profits from franchisees that never opened

25  proven to reasonable certainty despite the fact that the witness "did not offer any documentary

26  evidence comparing his operation to those of his competitors, did not discuss the market conditions

27  for quick-lube centers generally, did not assess the impact of the stock market crash of 1987 on the

28  likelihood of whether Lightning Lube would have gone public, and did not consider the impact of

United States District Court

For the Northern District of California

1    the 1990-91 recession on lube sales generally").

2         Those cases that do attach some mathematical component to the reasonable certainty analysis

3    further support Onyx's view that a probability of greater than 50% is sufficient to create a

4    "reasonable certainty." *See Wagner v. Apex Marine Ship Mgmt. Corp.*, 83 Cal. App. 4th 1444, 1452

5    (2000) (discussing the need for a more flexible construction of the statute of limitations in latent

6    disease cases because otherwise "most plaintiffs will be unable to prove that the likelihood of the

7    future illness is "reasonably certain," *i.e.*, greater than 50 percent, as courts generally require [for

8    damages].") (quoting *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 119 (D.C. Cir. 1982)

9    ("Recovery of damages for speculative or conjectural future consequences is not permitted. To meet

10   the "reasonably certain" standard, courts have generally required plaintiffs to prove that it is more

11   likely than not (a greater than 50% chance) that the projected consequence will occur."); *see also*

12   *Henderson v. Sheahan*, 196 F.3d 839, 850 (7th Cir. 1999) ("Although the Illinois courts have yet to

13   squarely define the meaning of "reasonable certainty," other jurisdictions have construed it to

14   require a showing that it was more likely than not (*i.e.*, greater than fifty percent probability) that the

15   plaintiff would develop the serious injury in the future [to recover damages].") (citing cases from the

16   Fifth and Sixth Circuits); *Weeks Dredging & Contracting, Inc. v. B. Turecamo Towing Corp.*, 482 F.

17   Supp. 1053, 1058 (E.D.N.Y. 1980) (describing reasonably certain lost profits as "what profits more

18   probably than not would have been earned had the incident not transpired"). Bayer contends that

19   *Wagner* is inapposite because it concerns latent disease in a tort action. However, though not

20   dispositive of the question, *Wagner*, like the instant case, involved analysis of a contingent event

21   that affected the availability of future damages. In *Wagner*, it was latent asbestos-related disease,

22   whereas here, it is FDA approval. Moreover, as Onyx points out, courts have treated tort and

23   contract cases as analogous for purposes of establishing future damages. *See Kids' Universe*, 95

24   Cal. App. 4th at 883.

25        At the least, then, California law provides no indication that an estimated 57% likelihood of

26   FDA approval cannot satisfy the reasonable certainty requirement. Moreover, as Judge Patel noted,

27   Onyx has pointed out that 57% is a low bar in this case, as it estimates an 80% likelihood that at

28

13

**United States District Court**
For the Northern District of California

1   least one of the indications will succeed.[4]  *See* Memorandum & Order at 20 (citing Onyx Opp. to

2   MSJ, Docket No. 96, at 24).  Accordingly, the Court cannot conclude that Onyx's expert testimony

3   is insufficient as a matter of law to demonstrate damages with reasonable certainty.  Bayer's motion

4   is denied.

### III.   WITNESSES

6   A witness or exhibit not listed in a party's pretrial conference statement may not be called or

7   used without good cause.  This rule does not apply to true rebuttal witnesses (other than experts).

8   Defense witnesses are normally considered case-in-chief witnesses, not "rebuttal" witnesses.

9   The parties shall file their final witness lists by noon, September 30, 2011.

### IV.   EXPERT REPORTS

11   The parties shall lodge all expert reports, including their supplemental expert reports, with

12   the Court no later than Wednesday, September 28, 2011.

### V.   EXHIBITS

---

[4]  In its summary judgment briefing, Bayer argued that Onyx had to prove each source of damages—the Breast AI and the CRC—separately, and therefore that it could not use the combined 80% probability of one indication receiving approval to establish reasonable certainty. *See* Reply ISO MSJ, Docket No. 106, at 13 n.11.  1However, California law is clear that a party must only prove *the fact of damages* to a reasonable certainty; it does not mandate that a party prove each individual source of damages separately, as long as all of those sources stem from the defendant.  *Israel v. Campbell*, 163 Cal. App. 2d 806, 816 (Cal. App. 1958) (discussing difficulty of awarding damages when some damages may have been caused by defendant and others may not be defendant's responsibility, but finding that problem did not apply where "[r]espondent's damages came from only one source, namely, appellant's default"); *see also Guntert & Zimmerman Const. Div., Inc. v. S.G.M.E. Usine Moser S.A.*, No. C-88-3866, 1992 WL 12602677, at *4 (N.D. Cal. June 3, 1992) ("Although certainty as to the fact of damages must exist, a more liberal rule is applied in determining the amount of the damages.").  Thus, if Onyx is able to present evidence at trial sufficient to demonstrate with reasonable certainty that one of the indications would succeed, whether it can prove that both would succeed goes more to the amount, rather than the existence, of damages.  For those determinations, California uses a liberal evidentiary rule.  *Grupe v. Glick*, 26 Cal.2d 680, 691-93 (Cal. 1945); *California Lettuce Growers v. Union Sugar Co.*, 45 Cal.2d 474, 486-87 (1955) ("[W]hen it clearly appears that a party has suffered damage a liberal rule should be applied in allowing a court or jury to determine the amount, and that, given proof of damage, uncertainty as to the exact amount is no reason for denying all recovery.") (quotation omitted); *Hunt Foods, Inc. v. Phillips*, 248 F.2d 23, 33 (9th Cir. 1957) (restating California rule); *Dillingham-Ray Wilson v. City of Los Angeles*, 182 Cal. App. 4th 1396, 1406 (2010) (same); *see also Macken v. Martinez*, 214 Cal. App. 2d 784, 790 (1963) ("As defendant's wrongful conduct made the exact ascertainment of damages difficult, he cannot complain because the court must make an estimate of the damage and not an exact computation, provided, of course, that the estimate is a reasonable one.")); *McConnell v. Corona City Water Co.*, 149 Cal. 60, 66 (Cal. 1906) ("It is no objection to . . . recovery that [damages] cannot be directly and absolutely proved.").  "It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party."  *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938, 939 (9th Cir. 1999) (finding that the court had exercised its discretion appropriately by "considering several possible theories for determining damages" and "declining to award compensation where it felt calculations were impermissibly speculative") (citing *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 599 (1970)).

1        Attached to this order as Exhibit A, the Court provides its rulings on Onyx's representative

2 exhibits to which Bayer objects.  Attached as Exhibit B, the Court provides its rulings on Bayer's

3 representative exhibits to which Onyx objects.  At the pretrial conference herein, the Court

4 explained the principles it employs in adjudicating relevance and admissibility.  The parties are

5 directed to meet and confer and resolve any remaining differences on objections.  The parties shall

6 submit a revised narrowed list of exhibits and any remaining objections by September 28, 2011.

7 **VI.    DEPOSITION DESIGNATIONS**

8        The Court has considered the parties' representative deposition designations and objections,

9 Docket No. 202.  With respect to Bayer's designation number 5, Robert Jones 22:23-23:1, the Court

10 reserves this question for trial as to whether Bayer has laid a sufficient foundation for the necessity

11 of impeachment.  With respect to Bayer's designation number 6, Robert Jones 113:25-114:22, the

12 Court reserves the question for trial as it is keyed to Exhibit 1077, for which the Court has

13 tentatively overruled Onyx's hearsay objection subject to a proper foundation at trial.  *See* Exhibit B.

14 With respect to all other representative deposition designations, the Court overrules the objections.

15 As with the exhibits, the parties shall meet and confer and resolve objections.  The parties shall

16 submit a revised (narrowed) list by September 28, 2011.

17 **VII.    VOIR DIRE**

18        Based on the parties' submissions and the Court's general practice, the Court intends to ask

19 the following voir dire questions during jury selection.  Counsel will be allowed a brief (20 minutes)

20 follow-up voir dire after the Court's questioning.

21        1.      Name

22        2.      City of residence

23        3.      Occupational Status

24        4.      Organizations

25        5.      Hobbies

26        6.      Marital Status

27        7.      Spouse's occupation

28        8.      Children (including ages).

9.     If a juror on another case

10.    If ever a grand juror

11.    If ever in the military.

12.    Who is (or was) your employer?

     a.     How long have you worked (or did you work) for that employer?

13.    Please describe your educational background, including where you went to school, your major areas of study, and any degrees you have received.

14.    The companies involved in this dispute are Bayer Corporation, Bayer AG, Bayer Healthcare LLC, Bayer Schering Pharma AG, Bayer HealthCare Pharmaceuticals, Inc., Bayer HealthCare Pharmaceuticals LLC (collectively referred to here as "Bayer") and Onyx Pharmaceuticals, Inc. (referred to here as "Onyx").

     a.     Other than in reference to the product Bayer Aspirin, have you ever heard of Bayer?

     b.     Have you ever heard of Onyx?

     c.     Have you, any member of your family, or any of your close friends ever worked for Bayer or Onyx or had any business relationship with Bayer or Onyx? Identify the person and explain.

     d.     Have you or any member of your immediate family ever owned any stock, bond, or ever had any financial interest in Bayer or Onyx?

15.    The law firms representing the parties involved in this dispute are Cooley LLP (formerly known as Cooley Godward and Cooley Godward Kronish), Morrison & Foerster LLP and Bartlit Beck Herman Palenchar & Scott LLP. Some of the specific attorneys involved are:

     From the law firm of Bartlit Beck Herman Palenchar & Scott LLP:

     Phil Beck

     Mark Levine

     Brian Swanson

     Scott McBride

**United States District Court**
For the Northern District of California

1           From the law firm of Morrison & Foerster:

2           Alison Tucher

3           From Bayer:

4           Scott Meece

5           From the law firm of Cooley LLP:

6           Stephen C. Neal

7           Martin S. Schenker

8           Michelle S. Rhyu

9           Benjamin Kleine

10          From Onyx:

11          Suzanne Shema

12  16.    Do you have any college education, training, experience, or current or past

13          employment in the following areas?

14      (1)    Pharmaceuticals

15      (2)    Medicine or healthcare

16      (3)    Biotechnology

17      (4)    Drug Discovery or Development

18      (5)    Chemistry including Medicinal Chemistry and Chemical Engineering

19      (6)    Biology

20  17.    The products that will be discussed in this case are cancer-fighting drugs.

21      (A)    Have you, a family member or a close friend ever had cancer?

22      (B)    Have you, a family member or a close friend ever taken the medication

23           Nexavar®?

24  18.    Do you have any personal experience or training specifically involving the drafting or

25          review of contracts, or dealing with a dispute over the terms of a contract, either in

26          connection with your job or as part of your personal life?

27  19.    Have you or an immediate family member ever started a business?

28  20.    Do you have any personal knowledge of this case, or have you read about or heard it

17

United States District Court

For the Northern District of California

1    discussed, or have an opinion regarding it?

2    21.    Have you or any member of your immediate family ever been a party to a lawsuit?

3    Please describe.

4    a.    Were you the plaintiff or defendant?

5    b.    How was the case resolved?

6    c.    Will your experiences from that lawsuit impact your ability to decide this case

7    in a

8    fair and impartial way?

9    22.    Are you or any member of your family an attorney or law student?

10    23.    The following is a list of individuals who might appear as a witness in this case. Are

11    you related to or personally acquainted with any of these individuals?

12    1.    Lila Adnane

13    2.    Shripad Bhagwat

14    3.    Hans Bishop

15    4.    Klaus Brandau

16    5.    Gideon Bollag

17    6.    Laura Brege

18    7.    Iain Cockburn

19    8.    N. Anthony Coles, Jr.

20    9.    Jacques Dumas

21    10.    Axel Eble

22    11.    Henry (Hank) Fuchs

23    12.    Mark Gelder

24    13.    Greg Giotta

25    14.    Arthur Higgins

26    15.    Bob Jones

27    16.    Juergen Lasowski

28    17.    Christopher Lipinski

1        18.     Nathalie Lokker

2        19.     Ted Love

3        20.     Tim Lowinger

4        21.     John Lyons

5        22.     Kemal Malik

6        23.     Bob Mass

7        24.     Frank McCormick

8        25.     Joerg Moeller

9        26.     Chris Peetz

10       27.     Wolfgang Plischke

11       28.     Len Post

12       29.     Paolo Pucci

13       30.     Mohan Rao

14       31.     Hollings Renton

15       32.     Bernd Riedl

16       33.     Rob Rosen

17       34.     Eric Rowinsky

18       35.     Peter Sandor

19       36.     Bill Scott

20       37.     Scott Wilhelm

21       38.     Todd Yancey

22 24. Do you have any other experience, opinion, or matter which you believe should be

23      called to the Court's or the parties' attention that might have some bearing on your

24      qualifications or ability to sit as a juror on this case, or which you think may prevent

25      you from rendering a fair and impartial verdict based solely upon the evidence and

26      the Judge's instructions as to the law?

27 25. Have you ever been involved in a serious business dispute? Briefly describe the

28      nature of the dispute and how it was resolved.

**United States District Court**
For the Northern District of California

**VIII.   JURY INSTRUCTIONS & VERDICT FORM**

The Court shall address the verdict form at a subsequent date.

Regarding instructions, as the Court noted at the pretrial conference, the parties are directed to meet and confer and try to reach an agreement on the instructions.  The parties shall file with the Court no later than noon Friday, September 23, 2011, a set of agreed upon instructions and the parties' respective positions and proposed language where they disagree.

In addition to the above, the parties shall provide the Court with any stipulated facts to be read to the jury, to be filed on September 23, 2011, along with the jury instructions.

IT IS SO ORDERED.

Dated:  September 21, 2011

_____
EDWARD M. CHEN
United States District Judge